IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

KATRINA MCCULLAR,      §
§
    Plaintiff,      §
§
v.      §     Civil Action No. 3:10-CV-1895-K
§
METHODIST HOSPITAL OF      §
DALLAS d/b/a CHARLTON      §
METHODIST HOSPITAL,      §
§
    Defendant.      §

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendant Methodist Hospital of Dallas d/b/a Charlton Methodist Hospital's ("Defendant") Motion for Summary Judgment (Doc. No. 15). Following its review and consideration of the motions, responses, replies, summary judgment record, and the applicable law, the Court rules that Defendant's Motion for Summary Judgment is **GRANTED**, and Plaintiff's claims are **dismissed with prejudice**. Defendant's Objections to Plaintiff's Appendix of Exhibits to Plaintiff's Response to Defendant's Motion for Summary Judgment are **overruled as moot**.

I.      **Factual Background**

Plaintiff Katrina McCullar ("Plaintiff"), who is African American, was hired by Susan Adair ("Ms. Adair"), Director of Clinical Outcomes in the Quality Department for Defendant, as a Clinical Outcomes Coordinator on September 2, 2008. Plaintiff claims

she was subjected to discrimination because of her race almost immediately after being hired.  Plaintiff initially shared an office with Tiffany Levine ("Ms. Levine"), an African-American co-worker in the Quality Department.  Ms. Adair, Plaintiff's supervisor, moved her from this work area to another space.  Plaintiff avers this was done to prevent her from being in close proximity to other African-American employees.

In October 2008, Ms. Adair directed Plaintiff to attend a certain Continuing Education Class.  In December 2008, Plaintiff attended that class, and when she returned from it, Ms. Adair verbally reprimanded her for failing to notify her Plaintiff would be gone from her office.  Ms. Adair then issued Plaintiff, and her two African-American co-workers, a written disciplinary warning for leaving the office to attend the class without prior approval from or first notifying Ms. Adair.  Plaintiff claims that several employees from her department attended the same class, but only the African-American employees were disciplined.  This written warning was placed in Plaintiff's employment file which she claims made her ineligible for bonuses and transfers to other departments.  Plaintiff says she was never informed prior to this disciplinary action that she was required to either obtain approval or notify her supervisor prior to being away from her office.  In an email the next day, Ms. Adair outlined her expectations regarding Plaintiff being gone from her office.  After this incident, Plaintiff complained to Kerri D. Frazier-White ("Ms. Frazier-White"), Director of Human Resources ("HR") for Defendant, that she was being subjected to discrimination, but no action was taken.

In another incident, Plaintiff attended a meeting at which Ms. Adair, her supervisor, presented Plaintiff's productivity report as her own.  According to Plaintiff, Ms. Adair made mistakes in the presentation of the data, so Plaintiff stood up and corrected the numbers.  After they returned from the meeting, Ms. Adair kicked open Plaintiff's door, which had been slightly ajar, pointed her finger in Plaintiff's face, and yelled at her about various work assignments and wanting an open door policy in the department.  Plaintiff claims Ms. Adair was angry that Plaintiff corrected her at the meeting in front of all the attendees.  Ms. Adair then left Plaintiff's office and kicked open Ms. Levine's door shouting the same directive about an open door policy.

A separate time, Plaintiff claims Martha Ballance, a white co-worker who had trained her, verbally attacked her in the hallway.  Ms. Ballance and another co-worker, Donna Bacchus were arguing about a third co-worker, Debbie Cline, whom Ms. Bacchus did not think was "up to speed" on her work.  Plaintiff walked up on the argument and heard her name mentioned; Ms. Ballance then turned to Plaintiff, pointed her finger in Plaintiff's face, and said she expected Plaintiff to help Ms. Cline.  Plaintiff responded that she did not take directions from a co-worker, only from her supervisor.  Plaintiff informed Ms. Adair of the incident.  At a meeting with all the employees, Ms. Adair directed all the employees to stop arguing and not to discuss an employee who was not present.

In March 2009, Plaintiff requested paid time off from Ms. Adair because she needed an urgent surgical procedure.  Ms. Adair did not immediately approve the request. Later that day, Ms. Adair saw Plaintiff's treating physician, Dr. Deshaunsranique Gray,

and tried to confirm Plaintiff was indeed scheduled to have surgery, but Dr. Gray refused to answer.  Ms. Adair returned to the office and gave Plaintiff approval for the requested leave.  The next day, Dr. Gray called Plaintiff and told her of the exchange and said she was placed in a difficult situation because Ms. Adair asked questions related to Plaintiff's private medical information.  Plaintiff confronted Ms. Adair, told her Dr. Gray was upset about the conversation, and said she had violated Plaintiff's privacy.  Plaintiff maintains that Ms. Adair never attempted to confirm leave requests submitted by white employees.  Plaintiff claims that the week prior, she overheard Ms. Adair give Ms. Ballance, a white co-worker, immediate approval when she requested paid time off for a medical procedure.  Plaintiff reported the incident to HR, but was told that because Dr. Gray did not share any information, her medical privacy rights were not violated.  Plaintiff also complained to HR that Ms. Adair did not delay approval for Ms. Ballance's requested leave, nor was her doctor approached to verify the surgery.  No action was taken in relation to this incident.  Plaintiff complains that, after the incident, Ms. Adair told her during an evaluation "to stop going to HR being a 'tattle tell'" about everything that happened in their department.

In December 2009, Ms. Adair reviewed Plaintiff's work performance.  Ms. Adair informed Plaintiff her work contained errors, and she attempted to write her up for those.  Plaintiff told Ms. Adair that some of the alleged errors were in fact not errors at all and white co-workers in the same position had made errors and were not written up.  Ms. Adair agreed, noted the inaccurate errors, and did not write Plaintiff up.  That same

month, Plaintiff applied for a position within Risk Management.  She was told she was ineligible because her employee file indicated she had been placed on a Performance Improvement Plan ("PIP").  In actuality, Plaintiff had never been placed on a PIP.  She approached HR to correct the mistake which they did.  Plaintiff did not hear anything else about the job.

In January 2010, Ms. Adair took a leave of absence and stepped down from her role as Plaintiff's supervisor.  Linda Miller ("Ms. Miller"), the Manager of Infection Control, was asked to oversee management responsibilities for the Quality Department until a new director could be appointed.  Lisa Mallinson ("Ms. Mallinson"), the senior Clinical Outcomes Coordinator, was asked to be the team lead in the Quality Department and work directly with Ms. Miller.  In February 2010, Kyllan Cody, who is also African-American, became Vice President of the Quality Department.  She began working with Ms. Miller to manage the Quality Department until a new director was appointed.

In March 2010, Plaintiff, Ms. Levine, an African-American co-worker, and Donna Culberson ("Ms. Culberson"), a white co-worker, helped save an infant's life outside of the workplace.  Plaintiff was nominated for the "Great Award," a program Defendant has to recognize employees for going above and beyond.  Keiyanna Roberts ("Ms. Roberts"), chair of the "Great Committee" which is in charge of this award, informed Plaintiff that she would not receive the award because her nomination was not approved by her supervisor.  Plaintiff claims Ms. Culberson was the only one to receive the award.  Also that month, Plaintiff applied for a PRN position in Defendant's Emergency Room ("ER").

Plaintiff spoke directly with the ER supervising physician who told her he could use her help in the ER. Plaintiff says she later received a call from Diana Cortez in HR who told her she could not work in the ER because the ER supervising physician decided he did not need any additional help, and because Plaintiff did not have enough ER experience. Plaintiff claims this was another instance of racial discrimination because she has 16 years experience as an ER nurse.

In either March or April 2010, Plaintiff was working with Ms. Levine on a project when Ms. Mallinson asked Ms. Levine to do something. Ms. Levine said she could not because she was working on a project for Plaintiff right then. In front of Plaintiff, Ms. Mallinson said to Ms. Levine, "'I bet you couldn't say no if I tightened this noose around your neck.'" Plaintiff was shocked by this comment and returned to her office. Ms. Mallinson approached her approximately 20 minutes later, apologizing for the comment, stating she knew it was wrong to say, and she could be fired. Plaintiff complains that after this incident, Ms. Mallinson began to systematically retaliate against Plaintiff out of fear she would report the comment to Human Resources. Specifically, Ms. Mallinson told Plaintiff not to attend the medicine committee meeting she had regularly been attending, without giving Plaintiff a reason. Instead, another coordinator replaced her at those meetings. Plaintiff was also removed from a multi-disciplinary stroke team committee meeting without explanation. Plaintiff brought this incident to the attention of Ms. Cody and Ms. Miller during a meeting, about one week after the incident. When

Plaintiff informed them of what was said, she was met with silence; they continued the meeting only as to Plaintiff's productivity report.

In April 2010, Plaintiff was confronted by Virginia Davis ("Ms. Davis"), the Quality Director for three of Defendant's campuses.  Ms. Davis, who is white, yelled at Plaintiff to help Ms. Cline, a white co-worker who was behind with her work.  Plaintiff responded that she had not finished her own work and also that she had not been trained in Ms. Cline's specific area.  While pointing her finger at Plaintiff, Ms. Davis yelled again saying, "Well, you're going to get trained now.  You need to do whatever you need to do to help her, and that's what the expectation is."  Plaintiff complains she was set up to fail, being required to do work she was not trained to do.  Plaintiff complains the white employees had not been subjected to similar conduct.  Plaintiff complained to Ms. Mallinson, who had witnessed the encounter, that she was not trained to do Ms. Cline's work.  After making the complaint, Plaintiff states that she was not made to help Ms. Cline with her work again.  At the end of April, Justine Bizette, was hired as the director of the Quality Department.

In May 2010, Plaintiff was called into a meeting with Ms. Cody and Ms. Miller.  Plaintiff was informed she was being issued a written disciplinary action for rude behavior.  Ms. Cody had received three different complaints that Plaintiff had been rude.  Plaintiff claims she was not given an opportunity to refute the accusations.  When she asked for the identity of the employees, Ms. Cody refused to divulge their names.  Plaintiff says she was later informed by Patrice Riley, an African-American employee in Care Management,

that Ms. Adair, Plaintiff's former supervisor, Ms. Mallinson, and Bonnie Bell, the Director of Care Management, concocted these false accusations.

In June 2010, Plaintiff attended a hospital meeting after normal work hours because data she had compiled was being presented.  Because the meeting took two hours, Plaintiff decided to report two hours late to work the next morning, as she claims was common practice.  Plaintiff was confronted that morning by Ms. Bizette, the recently hired director, about her late arrival.  Plaintiff said she had emailed Ms. Mallinson that she would arrive late the next morning.  Plaintiff complains she was confronted about it even though it was common practice.

On July 8, 2010, Ms. Bizette asked Plaintiff to resign or face being fired along with Defendant making a report to the Texas State Board of Nursing, which would have made it very difficult for Plaintiff to obtain another nursing position.  Plaintiff submitted her resignation.

On July 19, 2010, Plaintiff filed a charge of discrimination against Defendant with the Texas Workforce Commission.

## II.    Defendant's Motion for Summary Judgment

Plaintiff claims Defendant discriminated against her because she is African-American, and likewise she was subjected to a hostile work environment.  *See* 42 U.S.C. §2000e-2(a); 42 U.S.C. §1981.  (The Court will refer to Plaintiff's discrimination claims as racially based since her race, African-American, subsumes claims based on color and national origin as well.)  Specifically, Plaintiff alleges white co-workers were granted or

favored with privileges of better pay and recognition, received fewer reprimands and terminations. Plaintiff claims she was terminated solely because she is African-American, and she was replaced by Susan Adair, her former supervisor who is white, who had returned as a Clinical Outcome Coordinator after her leave of absence. Plaintiff argues the reasons given for her termination were pretext, as she had received only "glowing work appraisals" and any prior disciplinary actions were baseless. Plaintiff also claims that she was subjected to a hostile work environment of constant racism and discrimination. Defendant has moved for summary judgment on all of Plaintiff's claims, arguing that Plaintiff offers no evidence of discrimination or hostile work environment. However, had she offered sufficient evidence of discrimination, Plaintiff failed to meet her burden to show that Defendant's legitimate, nondiscriminatory reasons were pretext. Additionally, most evidence Plaintiff offered to show a hostile work environment was not raced based, and the few instances of arguably raced based conduct fails to establish conduct sufficiently severe and pervasive.

A.      **Summary Judgment Standard**

Summary judgment is appropriate when the pleadings, affidavits and other summary judgment evidence show that no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law. FED.R.CIV.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A dispute of a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All evidence and

reasonable inferences must be viewed in the light most favorable to the nonmovant, and all disputed facts resolved in favor of the nonmovant. *See United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962); *Boudreaux v. Swift Transp. Co., Inc..,* 402 F.3d 536, 540 (5th Cir. 2005).

The moving party bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact. *Celotex,* 477 U.S. at 322-25. Once a movant makes a properly supported motion, the burden shifts to the nonmovant to show the existence of a genuine fact issue for trial; but, the nonmovant may not rest upon allegations in the pleadings to make such a showing. *Id.* at 321-25; *Anderson,* 477 U.S. at 255-57. The nonmovant may satisfy this burden by providing depositions, affidavits, and other competent evidence; not with "conclusory allegations, speculation, and unsubstantiated assertions." *Douglass v. United Servs. Auto. Ass'n,* 79 F.3d 1415, 1429 (5th Cir. 1996) (en banc). Conclusory allegations, unsubstantiated assertions, or a mere scintilla of evidence cannot defeat a motion for summary judgment. *See Anderson,* 477 U.S. at 249-52; *Boudreaux,* 402 F.3d at 540. If the nonmovant fails to make a sufficient showing to prove the existence of an essential element to the case and on which the nonmovant will bear the burden of proving at trial, summary judgment must be granted. *Celotex,* 477 U.S. at 322.

### B.    Racial Discrimination

Under Title VII, an employer cannot fail or refuse to hire, or to discharge any individual, or otherwise discriminate against any individual with respect to his

compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.  42 U.S.C. § 2000e-2(a)(1).  The inquiry under Title VII then is whether the defendant-employer intentionally discriminated against the plaintiff-employee based upon one of the factors prohibited by Title VII.  *Johnson v. Louisiana,* 351 F.3d 616, 621 (5th Cir. 2003) (*citing United States Postal Service Bd. of Governors v. Aikens,* 460 U.S. 711, 715 (1983)).  Claims for race discrimination based on section 1981 follow the same analysis under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), as do discrimination claims based on Title VII.  *Brooks v. Lubbock County Hosp. Dist.*, 373 Fed.Appx. 434, 436 (5th Cir. 2010).

Discrimination claims may be proven by direct or circumstantial evidence.  *Howard v. United Parcel Serv., Inc.*, 447Fed.Appx. 626, 629 (5th Cir. 2011) (citing *Machinchick v. PB Power, Inc.*, 398 F.3d 345, 350 (5th Cir. 2005)).  When the plaintiff presents only circumstantial evidence related to the discrimination claim, the *McDonnell Douglas* burden shifting analysis applies.  *Id.*  The plaintiff must first demonstrate a *prima facie* case of discrimination by establishing: (1) she is a member of a protected class; (2) she is qualified for the position; (3) she was subjected to an adverse employment action; and (4) she was treated less favorably because she belonged to the protected class than other similarly situated co-workers who were not members of the protected class.  *McDonnell Douglas*, 411 U.S. at 802.  Once the plaintiff has met her burden, it shifts to the defendant who must provide a legitimate, nondiscriminatory reason for the adverse employment action.  *Id.*  The defendant's burden is one of production, not persuasion,

so no credibility determinations are required.  *Howard*, 447 Fed.Appx. at 629 (citing *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 222 (5th Cir. 2000)).  If the defendant meets its burden, the plaintiff must then offer sufficient evidence to rebut the defendant's legitimate, nondiscriminatory reason.  The plaintiff must create a genuine issue of material fact by showing either: (1) the defendant's reason is not true, but is instead a pretext for discrimination (pretext alternative), and the protected characteristic was the determinative basis for the employment action; or (2) the defendant's reason, while true, is only one of the reasons for its conduct, and another motivating factor is the plaintiff's protected characteristic (mixed-motive alternative).  *See Alvarado v. Texas Rangers*, 492 F.3d 605, 611 (5th Cir. 2007); *see also Keelan v. Majesco Software, Inc.*, 407 F.3d 332, 341 (5th Cir. 2005).  Under the pretext alternative, the plaintiff bears the ultimate burden of proving discrimination.  *Keelan*, 407 F.3d at 340-41 (*citing Raytheon Co. v. Hernandez*, 540 U.S. 44, 49 & n.3 (2003)).

### 1.    *Prima Facie* Case of Discrimination

Plaintiff presents only circumstantial evidence related to her discrimination claim, so the *McDonnell Douglas* burden shifting analysis applies.  *Howard*, 447 Fed.Appx. at 629. In establishing a *prima facie* case of discrimination, Plaintiff must show: (1) she is a member of a protected class; (2) she is qualified for the position; (3) she was subjected to an adverse employment action; and (4) she was replaced by someone outside of the protected class, or, in case of disparate treatment, that other similarly situated co-workers

were treated more favorably. *Bryan v. McKinsey & Co., Inc.*, 375 F.3d 358, 360 (5th Cir. 2004).

Plaintiff claims she was subjected to the following discrimination: (1) she was given more work assignments than other white Clinical Outcomes Coordinator; (2) she was watched closely as to her comings and goings; (3) she was verbally accosted on three occasions; (4) she was approached harshly by other employees (e.g., fingers pointed in her face, her door kicked open); (5) she was prevented from attending certain functions in which she has previously participated; (6) she was subjected to a hostile work environment, which included racially based comments; (7) her lunch breaks were monitored; (8) she received written disciplinary action for attending a required meeting, which affected her ability to earn bonuses and be transferred to another department; and (9) she was ultimately terminated.

Defendant concedes that Plaintiff satisfies the first and second elements of the analysis in that: (1) she is a member of a protected class because she is African-American and (2) she is qualified for the job she held.  As for the third element, Defendant does not dispute that she suffered an adverse employment action regarding her termination. However, Defendant disputes that Plaintiff suffered any other adverse employment action, except a possible claim related to being paid less than other Clinical Outcome Coordinators.  Instead, Defendant argues that most every allegation of discrimination Plaintiff claims is merely every instance of unfair treatment she perceives she suffered.

As for the adverse employment actions of termination and possible disparity in pay,

Defendant disputes that Plaintiff can satisfy the fourth and final element.

### a.     Third Element--Adverse Employment Action

The law is well established that adverse employment actions involve ultimate

employment decisions relating to discharge, demotion, hiring, refusal to promote, granting

leave, compensation, and reprimand.  *See Harrington v. Harris*, 118 F.3d 359, 365 (5th

Cir. 1997); *Bouvier v. Grumman Ship Sys., Inc.*, 350 Fed.Appx. 917, 922 (5th Cir. 2009).

Decisions that do not affect job duties, pay or benefits are not considered an adverse

employment action for purposes of Title VII.  *Roberson v. Game Stop/Babbage's*, 152

Fed.Appx. 356, 360 (5th Cir. 2005); *see Cannon v. St. Paul Fire & Marine Ins. Co.*, Civ. No.

3:03-CV-2911-N, 2005 WL 1107372, *3 (N.D. Tex. 2005)(Godbey, J.)(written warnings

and complaints are not adverse employment actions).  The Fifth Circuit has warned

against enlarging the definition of adverse employment action to encompass such things

as "disciplinary filings, supervisor's reprimands, and even poor performance by the

employee." *Id.* (citing *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 407 (5th Cir.

1999)).

### 1)     Plaintiff's Termination

Defendant concedes that Plaintiff's termination indeed satisfies this element.  *See*

*Bouvier*, 350 Fed.Appx. at 922; *Harrington*, 118 F.3d at 365.

2)      Plaintiff's Pay

The Court now addresses whether Plaintiff's claim related to her pay qualifies as an adverse employment actions. Plaintiff makes a general statement in her complaint that she did not receive "equal pay for equal work", and alluded in her complaint and deposition that she suffered pay inequities. She referred to a "profitability bonus" she was prevented from earning because of the written disciplinary action related to attending the meeting. Plaintiff also claimed that she was paid less than other white Clinical Outcome Coordinators even though she had more education and experience.

In her responsive briefing to Defendant's summary judgment motion, Plaintiff offered an argument entitled "Plaintiff Can Establish that she was Subject to Adverse Employment Actions in addition to Termination" [sic]. However, a review of this two paragraph argument reveals that Plaintiff advances no other instance of adverse employment action, but her termination. There is absolutely nothing related to her pay. Therefore, the Court finds that any other claim of adverse employment action Plaintiff may have previously asserted fails for a complete lack of argument in her briefing. The Court is not required to sift through the summary judgment record to discern possible instances of adverse employment action. *See Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir.1998).

Even if Plaintiff had made the argument that her pay claim was an adverse employment action, the Court would find Defendant's actions related to her pay were not an adverse employment action. As evidence related to the "profitability bonus," Plaintiff

offered only her own statement.  There is no evidence this bonus was offered, or even who received it.  Moreover, it was a bonus.  This was not a pay increase that she was denied because of the written warning.  This Court has previously held that interference with an employee's ability to earn bonuses does not amount to an adverse employment action. *See Simmons v. Cadence Design Sys., Inc.*, Civ. No. 3:05-CV-1921-K, 2007 WL 4104373, *9 (N.D. Tex. Nov. 16, 2007)(Kinkeade, J.)(no adverse employment action where plaintiff complained of, among other things, reduced pay because he was assigned less profitable projects which interfered with his ability to earn bonuses).  Therefore, her failure to earn a bonus would not qualify as an adverse employment action even if she had properly advanced the argument.

Any such claim related to being paid less than other non-black Clinical Outcome Coordinators does not constitute an adverse employment action either.  Plaintiff testified in her deposition that she was promised lateral pay when she first spoke with Defendant's Human Resources ("HR") about the Clinical Outcome Coordinator position.  However, she was informed on the phone *before* she received and accepted Defendant's job offer that she could not make more than the senior most Clinical Outcome Coordinator, which was less than her then-current position with Parkland.   Ultimately, Plaintiff learned that the senior person in her department was Ms. Mallinson, who is white and had been in that position for two years.  Ms. Mallinson has a two-year degree in nursing, whereas Plaintiff has a four-year degree and a masters degree.  According to Plaintiff, Ms. Mallinson also

did not have as much experience, "quality" or clinical, as Plaintiff had.  After receiving the official written offer which included the pay rate, Plaintiff accepted the offer.

Any claim related to the promise of lateral pay was just that–a promise.  Plaintiff was not even an employee of Defendant at that time.  The official offer contained the actual pay rate Plaintiff received; and Plaintiff accepted that offer.  This promise cannot qualify as an adverse employment action.  As for any argument that Plaintiff was paid less than other non-black Clinical Outcome Coordinators, Plaintiff was informed on the phone *before* she received and accepted Defendant's job offer that she could not make more than the senior most coordinator.  Plaintiff later learned that Ms. Mallinson was that person, having been there two years.  And while Plaintiff holds a masters degree, which Ms. Mallinson does not, Plaintiff admits in her deposition that a masters degree was not required for the job, only preferred.  Moreover, Plaintiff presents no actual evidence establishing she was paid less than any other Clinical Outcome Coordinator.  Plaintiff's own subjective beliefs are not sufficient to establish that she suffered discriminated.  *See Johnson v. UAH Prop. Mgmt., Ltd. P'ship*, 428 Fed.Appx. 311, 312 (5th Cir. 2011)(citing *Armendariz v. Pinkerton Tobacco Co.*, 58 F.3d 144, 152 (5th Cir. 1995)).  She provides absolutely no evidence of her pay, nor that of the higher paid non-black employee(s) in her same position.  Accordingly, there is nothing for the Court to review to make a finding there was even a discrepancy.  This alleged disparate pay claim cannot constitute an adverse employment action either.

### 3)     Other Possible Adverse Employment Actions

The case law is well established that only ultimate employment decisions relating to discharge, demotion, hiring, refusal to promote, granting leave, compensation, and reprimand are adverse employment actions.  *See Harrington*, 118 F.3d at 365; *Bouvier*, 350 Fed.Appx. at 922.  Decisions not affecting job duties, pay or benefits are not adverse employment actions for purposes of Title VII.  *Roberson*, 152 Fed.Appx. at 360.  More importantly, the Fifth Circuit has specifically warned courts not to enlarge the definition of adverse employment action to encompass such things as "disciplinary filings, supervisor's reprimands, and even poor performance by the employee."  *Id.* (citing *Shackelford*, 190 F.3d at 407).  This Court has previously held that allegations of "differential management, unwarranted job performance scrutiny, performance requirement standards, and ignoring complaints of disparate treatment" do not fall within the definition of adverse employment action.  *Simmons*, 2007 WL 4104373 at *9 (no adverse employment action where plaintiff complained of different management of him compared to non-minority employees, constant scrutiny of him, directing him on his job performance, more job performance requirements and expectations of him compared with his non-minority co-workers, reduced pay by assigning him less profitable projects which interfered with his ability to earn bonuses, ignoring his complaints of disparate treatment due to his race, not being assigned an office cubicle, receiving allegedly offensive emails, and being required to perform practice demonstrations to test his knowledge of the defendant's application).

Plaintiff appears to claim the following are also adverse employment actions: (1) she was given more work assignments than other non-black Clinical Outcomes Coordinator; (2) she was watched closely as to her comings and goings; (3) she was verbally accosted; (4) she was approached harshly (e.g., fingers pointed in her face, her door kicked open); (5) she was prevented from attending certain functions in which she has previously participated; (6) she was subjected to a hostile work environment; (7) receiving written disciplinary action for attending a mandatory meeting without notifying her supervisor when she was never told there was a policy requiring her to do so; and (8) her lunch breaks were monitored.  None of these claims constitute adverse employment action as contemplated under current case law.  *See Roberson*, 152 Fed.Appx. at 360 (decisions not affecting job duties, pay or benefits are not adverse employment actions for purposes of Title VII); *Cannon*, 2005 WL 1107372, at *3 (placing written reprimands in employee's file is not an adverse employment action).

In conclusion, the Court finds that Plaintiff has not adequately demonstrated she suffered any adverse employment action other than her termination.

b.      Fourth Element–Less Favorable Treatment

To make her *prima facie* showing of discrimination as it relates to her termination, Plaintiff must establish that she received less favorable treatment than other non-black coordinators.  After being terminated, Plaintiff claims she was replaced by Ms. Adair, her former supervisor who is white.  Defendant offers no evidence disputing Plaintiff's claim

that she was replaced by Ms. Adair.  The Court concludes Plaintiff has satisfied the fourth

element, and established a *prima facie* case of discrimination related to her termination.

### 3.    Defendant's Legitimate, Nondiscriminatory Reasons

The Court now turns to the second step of the *McDonnell Douglas* analysis wherein

Defendant must provide a legitimate nondiscriminatory reason for Plaintiff's termination.

*McDonnell Douglas*, 411 U.S. at 802.  Defendant's burden is one of production, not

persuasion, so no credibility determinations are required.  *Howard*, 447 Fed.Appx. at 629

(internal citation omitted).

The Court concludes Defendant has offered legitimate, nondiscriminatory reasons

for Plaintiff's termination, establishing through competent summary judgment evidence

that Plaintiff was terminated for unacceptable job performance issues and problems with

her behavior.  Defendant submits the affidavit of Ms. Justine Bizette, the Director of

Quality Services and the person who made the decision to terminate Plaintiff, as well as

the written disciplinary action form outlining the reasons for her termination.  The

reasons outlined on the form are listed as unacceptable job performance including: (1)

"lack of accurate and timely mortality case reviews"; (2) "lack of accurate quality reviews

based on CMS criteria for stroke cases"; (3) low productivity compared with other clinical

outcome coordinators; (4) lack of professionalism; and (5) failure to work effectively with

others.

As further support of these reasons, Defendant also offers the following: the

affidavits of (1) Ms. Adair, Plaintiff's former supervisor, (2) Ms. Miller, interim manager

of the Quality Department, and (3) Ms. Cody, vice-president of the Quality Department, all of which further document these specific on-going problems.  Both Ms. Miller and Ms. Cody swear in their affidavits that upon assuming their new roles in the Quality Department, they received data indicating Plaintiff had the lowest productivity rate in the Clinical Outcomes Department.  Ms. Bizette's affidavit reveals that Plaintiff was six months behind in her mortality reviews and, upon reviewing cases Plaintiff had already reviewed, she found 17% of the cases contained errors.  The affidavits also confirm problems with Plaintiff's behavior.  Ms. Cody stated in her affidavit that she received complaints from three different individuals, at separate times, reporting "rude and abrasive" behavior from Plaintiff.  The complaints all "followed a similar pattern of behavior" by Plaintiff.  All three individuals told Ms. Cody that they feared Plaintiff would retaliate against them if she learned they had made the complaints.

Defendant also provided prior written disciplinary reports dated January 2009 and May 2010.  (The Court did not consider a disciplinary action form dated December 7, 2009, outlining a "verbal consultation" which Ms. Adair allegedly had with Plaintiff, as Plaintiff did not sign this form and Plaintiff denies every having seen it.)  These written reports document problems Plaintiff's supervisors had with her.

The Court finds all the foregoing reasons provided by Defendant are legitimate, nondiscriminatory reasons.  *See Little v. Republic Refining Co.*, 924 F.2d 93, 96 (5th Cir. 1991)(poor job performance is a legitimate, nondiscriminatory reason); *Harrison v. Assoc. Corp. of North America*, 917 F.2d 195, 199 (5th Cir. 1990)(abrupt and abusive behavior

of the plaintiff lead to animosity in her department which was legitimate, nondiscriminatory reason); *Crouch v. J C Penney Corp., Inc.*, 337 Fed.Appx. 399, 402 (5th Cir. 2009)(unprofessional behavior is a legitimate, nondiscriminatory reason). Defendant's burden is satisfied, and the burden now shifts back to Plaintiff to show evidence of pretext and/or mixed motive rebutting these reasons, thereby creating a genuine fact issue.

### 4.    Plaintiff's Burden to Show Pretext or Mixed Motive

Plaintiff must now offer sufficient evidence to create a genuine issue of material fact showing either: (1) that Defendant's reasons are not true, but instead a pretext for discrimination (pretext alternative), and her race was the determinative basis for the employment action; or (2) that Defendant's reason, while true, is only one of the reasons for its conduct, and another motivating factor is Plaintiff's race (mixed-motive alternative). *See Alvarado*, 492 F.3d at 611; *see also Keelan,* 407 F.3d at 341.

In her responsive briefing, Plaintiff argues that Defendant's reasons for terminating her are merely pretext. She does not admit, even as an alternative argument, that any of the reasons are true; therefore, Plaintiff must proceed under the pretext standard. *See Jackson v. Watkins,* Civ. No. 3:07-CV-1837-D, 2009 WL 1437824, *7 (N.D. Tex. 2009) (Fitzwater, C.J.)(employee who did not admit that any of employer's reasons were true opted to proceed under pretext model and was required to show that employer's proffered reasons for its actions were pretext); *Kretchmer v. Eveden, Inc.,* Civ. No. 3:07-CV-1068-D, 2009 WL 854719, *7 n.8 (N.D. Tex. 2009)(Fitzwater, C.J.) (same); *see, e.g., Richardson*

*v. Monitronics Intl., Inc.,* 434 F.3d 327, 333 (5th Cir. 2005)(mixed-motive framework applies where employee concedes that discrimination was not the *sole* reason for his or her discharge)(emphasis in original).   Accordingly, to meet her burden, Plaintiff must establish through sufficient evidence a genuine issue of material fact exists that <u>each</u> of Defendant's reasons are pretext.  *See Jackson,* 2009 WL 1437824, at *7 (citing *Wallace,* 271 F.3d at 220)(emphasis added).

Plaintiff makes the following assertions in support of her argument that the reasons are simply pretext:  (1) Plaintiff never received a performance evaluation that she was not meeting job expectations; (2) Plaintiff contends she received written disciplinary action only twice, both which were unsupported–once for attending a mandatory meeting and not being informed of any policy related to notifying her supervisor, and also for unsubstantiated claims that she was rude to three co-workers; (3) non-black employees who made errors in their work were permitted to correct their mistakes, but Plaintiff was not; and (4) Defendant provided Plaintiff with a productivity document reflecting errors in her work that it knew was inaccurate.  Although Plaintiff makes the argument that Defendant's reasons were pretext, she offers no actual evidence of that.  *See Martin v. Waring Investments Inc.*, 323 Fed.Appx. 313, 316-17 (5th Cir. 2009).  Therefore, for the following reasons, the Court concludes that Plaintiff has failed to meet her burden of establishing each of Defendant's legitimate, nondiscriminatory reasons were actually pretext for racial discrimination resulting in her  termination.

a)      Plaintiff's Prior Job Performance Evaluations

Plaintiff claims she "never received a performance evaluation that indicated that she did anything less than meet expectations of your [sic] job." Therefore, according to Plaintiff, this is evidence of pretext.  Plaintiff  provides no support for this claim other than her own deposition testimony that "My performance was–I met expectations according to all my evaluations.  I performed well."  Plaintiff produces no written job performance evaluations.  The Court finds Plaintiff's mere statement that she understood she met her job expectations is wholly insufficient to establish a genuine fact issue that Defendant's reason was pretext.

b)      Only Two Written Disciplinary Actions

Next, Plaintiff claims the two written disciplinary actions she received are evidence of pretext.  Again, Plaintiff makes no specific argument as to how they are evidence of pretext.  The first written disciplinary action addresses Plaintiff's failure to notify Ms. Adair, her supervisor, of her absence related to attending a meeting.  Plaintiff offers no argument as to how this establishes pretext, and none of her proffered evidence shows pretext.  Plaintiff's subjective belief that this disciplinary action was driven by discrimination is insufficient. *See Johnson*, 428 Fed.Appx. at 312.

The second disciplinary action for her rude behavior also is not evidence of pretext. In her deposition, Plaintiff claims that the complaints made by three co-workers about her rude behavior were "unsubstantiated" and were actually concocted by Ms. Adair, Plaintiff's former supervisor, Ms. Mallinson, and Bonnie Bell, the Director of Care

Management, according to Patrice Riley, an African-American employee in Care Management.  But Ms. Cody's affidavit directly controverts that claim.  She detailed the complaints from the three different employees, all from outside departments:  Ms. Julie Glasgow, from the Medical Office complained that Plaintiff was so rude to her once that it left her in tears, and she was afraid to interact with Plaintiff again; Ms. Nancy Wingler, from Medical Records, complained that Plaintiff yelled at her and was very rude when looking for medical records, including interrupting Ms. Wingler when she was taking a phone call; and Ms. Kelly Wauters, Director of Medical Records, complained that her employees did not like to interact with Plaintiff because she was difficult to get along with, and Plaintiff would not always sign out medical records that she took from that department and acted offended when confronted by department employees looking for the records.  Plaintiff offers absolutely no evidence rebutting Defendant's evidence, to prove her claim that this written disciplinary action was completely false and, therefore, evidence of pretext.

Plaintiff fails to establish pretext through these written disciplinary reports.

<u>c)</u>      Errors in Plaintiff's Work

Plaintiff argues she was not permitted to correct errors in her work while non-black employees were which is further evidence of pretext.  Plaintiff specifically refers to the productivity report shown to her in March 2010.  She alleges this report inaccurately reflected her work, indicating she had errors in her work as well as the lowest productivity

rate in the department.  Plaintiff argues Defendant attempted to use this report "to set up the pretext," asking her to sign it, which she refused to do.

In support of this argument, Plaintiff cites the Court to her deposition testimony, the productivity report itself, and two emails.

1)    Productivity Report

The productivity report itself is simply not evidence of pretext.  This report, which both Plaintiff and Defendant submitted in their respective appendices, is not self-explanatory.  Plaintiff makes no attempt to explain the information in that report to the Court, nor any attempt to explain how it is inaccurate.  It is clear from the report that it reflects Plaintiff's work from July-December 2009.  Outside of this information, the Court can interpret nothing else.  It is comprised of two tables–one entitled "Abstractions" and one entitled "Chart Reviews."  Each table contains a line for the months of July through December, with the letters "KM" next to those (likely referring to Plaintiff, Katrine McCullar, although again an inference).  Outside of this information, the Court cannot decipher the other sections and what the numbers indicate.  Again, Plaintiff offers no explanation as to this data and, more importantly, how it is inaccurate.  The Court is left solely with her subjective belief that the report is inaccurate.

2)    Emails

As additional evidence, Plaintiff cites the Court to two separate emails she sent to her attorney.  The first email (marked as Plaintiff's exhibit A-12) contained an email to Ms. Cody from Ms. Jody Tolar, an unidentified employee of Defendant, on which

Plaintiff was copied.  In this message, Ms. Tolar informs Ms. Cody that Plaintiff brought "some backup information" for Ms. Cody's review after a meeting the prior day, and that Plaintiff would like to speak with Ms. Cody about it that afternoon.  In the message to her attorney, Plaintiff says that the copied email related to the meeting about her productivity, and the report they provided her was inaccurate.  Again, she merely states that the information in this report was not correct, and "some of her work is not captured in the data base" from which the report was produced.  There is no further explanation of any information contained in the report.  This is not sufficient evidence for the Court to find pretext of discrimination.

Plaintiff cites the Court to a second email (marked as Plaintiff's exhibit A-13) which she claims is evidence that she was not permitted to correct errors in her work, but non-black employees were.  This email contains a copy of three separate emails from three of Plaintiff's white co-workers, allegedly referencing corrections they made to their work. As with the first email, this email falls far short of supporting Plaintiff's claim Defendant's reasons were pretext.  The Court must make too many inferences as to the information contained in the messages.

Initially, the Court notes that the third copied email, from Donna Standridge, is too cryptic for the Court to clearly read as referencing corrections at all.  It merely says, "Revised with CFG's."  The Court will not guess as to the meaning of this message, and so disregards consideration of it as evidence.

As for the other two copied emails, Plaintiff claims these messages are evidence that white co-workers were allowed to make corrections without reprimand.   The Court cannot make such a conclusion.  The emails do indicate these two individuals made a correction and where or how it was saved.  But, this is the extent of what these emails reveal.  There is no evidence supporting Plaintiff's claim that they were not reprimanded for these corrections; only Plaintiff's statement to that effect.  Furthermore, there is no indication or explanation as to what information or work these women corrected, and whether it was their own work.  Moreover, Plaintiff offers no evidence that she made corrections to her work and was reprimanded, or even that she attempted to make corrections but was refused permission.  The Court concludes this email is also not sufficient evidence of pretext.

### 3)     Plaintiff's Deposition Testimony

Plaintiff also cites the Court to her deposition testimony that she kept manual records of her work which allegedly proved the information in the productivity report was inaccurate.  Plaintiff did not, however, produce the actual manual records which she claims clearly establish that the productivity report was inaccurate.  Plaintiff makes no showing, or even attempt to show, how her manual records contradicted the computer driven report.  The Court is left in the same position as it was with the actual productivity report itself–there is no evidence explaining how the data is incorrect, only Plaintiff's statement that it is, and absolutely no explanation as to how her statement is evidence of pretext.

Plaintiff cites the Court to her deposition testimony as evidence that she was not permitted to make corrections to her work, but non-white employees were.  As the Court has previously mentioned, Plaintiff's conclusory, unsubstantiated statements are not sufficient to rebut Defendant's legitimate, nondiscriminatory reasons.

Even taking all of Plaintiff's supporting evidence together, the Court finds it is completely insufficient to create a genuine fact question of pretext.  The Court concludes Plaintiff has failed to meet her burden.

### c.    Must Address Each of Defendant's Reasons

Even if the Court were to find that Plaintiff did create a fact issue as to pretext, Plaintiff did not specifically address each of Defendant's legitimate, nondiscriminatory reasons for her termination.  *See Jackson*, 2009 WL 1437824 at *7 (must show through sufficient evidence there is genuine issue of material fact that each of the defendant's reasons are pretext).  She merely argued the foregoing incidents were evidence of pretext, without specifically referencing which of Defendant's reasons it rebutted.  Her failure to refute each of Defendant's legitimate, nondiscriminatory reasons alone amounts to a failure to meet her burden to show the reasons were pretext.  *See Turner v. Richardson Baylor Medical Center,* 476 F.3d 337, 346-47 (5th Cir. 2007)(plaintiff's failure to attempt to refute each of defendant's proffered reasons justified summary judgment on the discrimination claim).  Therefore, summary judgment would be appropriate for this reason as well.

### d. Defendant's Reasons Are Still Legitimate and Nondiscriminatory Even if They Are Incorrect

Finally, the Court notes that an employer's reasons, even if incorrect, can be legitimate and nondiscriminatory. A defendant is allowed to be incorrect when determining the grounds or factual basis for the adverse employment action if there is no discriminatory intent against the plaintiff when making that decision. *See Vaughn v. Woodforest Bank*, 665 F.3d 632, 636 (5th Cir. 2011)(citing *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 899 (5th Cir. 2002)). As already discussed, much of Plaintiff's arguments center on Defendant's reasons being wrong or inaccurate as related to the complaints about her rude behavior and her productivity. However, Plaintiff could not meet her burden of showing pretext by simply arguing, as she does, that Defendant had an inaccurate productivity report and the complaints about her allegedly rude behavior were false. Even if she had proven the report was inaccurate and the complaints were false, Defendant's reasons can still be legitimate and nondiscriminatory when wrong. Plaintiff was required to establish Defendant had discriminatory intent, which she did not prove. *See Vaughan*, 665 F.3d at 636; *Little*, 924 F.2d at 97(an incorrect belief that employee performed inadequately was legitimate, nondiscriminatory reason for her discharge).

### e. Workplace Comments as Circumstantial Evidence

Plaintiff refers to two comments made by Ms. Mallinson, a white co-worker, in her complaint and her deposition, which the Court. Although Plaintiff does not specifically

refer to these comments as circumstantial evidence of discrimination, the Court will address them as such in an abundance of caution. In one comment, Ms. Mallinson told another African-American co-worker, while in Plaintiff's presence, "I bet you couldn't say no if I tightened this noose around your neck." Another time, Plaintiff overheard Ms. Mallinson comment in the lunchroom that her aunt said "all black people stink."

These statements may be probative of discriminatory intent if accompanied by other evidence of pretext. *Palasota v. Haggar Clothing Co.,* 342 F.3d 569, 577 (5th Cir. 2003). The Court has already concluded, however, that Plaintiff has failed to meet her burden of proving other evidence of pretext. So, these statements standing alone cannot be considered sufficient evidence of pretext. *See id.*

### 5. Conclusion

Plaintiff's subjective beliefs that she was subjected to discrimination are insufficient to show pretext. *See Little*, 924 F.2d at 96. Plaintiff's deposition statements simply repeat the conclusory allegations and unsubstantiated assertions in her complaint. The other evidence, if even competent summary judgment evidence, Plaintiff submitted to the Court is does not support a finding of pretext either. For all the foregoing reasons, the Court concludes Plaintiff has failed to meet her burden to show Defendant's reasons were false and there is a genuine issue of material fact as to pretext.

The Court concludes summary judgment is appropriate for all of Plaintiff's racial discrimination claims.

C.      Hostile Work Environment

Although Plaintiff does not formally, or even clearly, allege a claim of hostile work environment in her complaint, the Court will nonetheless address it as she references a hostile work environment in her deposition.

For a hostile work environment claim, Plaintiff must establish: (1) she belongs to a protected class; (2) she was subjected to unwelcome harassment; (3) the harassment complained of was race-based; (4) the harassment affected a term, condition, or privilege of employment; and (5) Defendant knew or should have known about the harassment, and it failed to take prompt remedial action. *See EEOC v. WC&M Enterprises, Inc.*, 496 F.3d 393, 399 (5th Cir. 2007). A hostile work environment claim may be supported by evidence of harassment that is sufficiently severe or pervasive in that it alters the conditions of employment and creates an abusive working environment. *See Celestine v. Petroleos de Venezuella SA*, 266 F.3d 343, 353 (5th Cir. 2001). But,"simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)(quoting *Oncale v. Sundowner Offshore Services, Inc.* 523 U.S. 75, 81 (1998)). This standard is purposely demanding to ensure "Title VII does not become a 'general civility code.'" *Faragher*, 524 U.S. at 788. Moreover, the "mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee" is not sufficient to alter the terms and conditions of the plaintiff's employment in the context of Title VII. *Rogers v. EEOC*, 454 F.2d 234, 238 (5th Cir. 1971).

The allegedly harassing conduct must be offensive both subjectively to the victim and objectively, such that a reasonable person would consider it to be hostile. *WC&M*, 496 F.3d at 399. To determine whether the conduct was objectively offensive, the court uses a totality-of-the-circumstances test, looking specifically to "'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating . . . and whether it unreasonably interferes with an employee's work performance.'" *Walker v. Thompson*, 214 F.3d 615, 625 (5th Cir. 2000) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). No single factor considered by the Court is determinative of whether it is objectively offensive. *WC&M*, 496 F.3d at 399. Assuming without deciding that Plaintiff established her work environment was subjectively offensive, the Court concludes she has not established that it was also objectively offensive.

Plaintiff must show an "ongoing pattern of racially inappropriate incidents directed towards [her]." *Howard*, 447 Fed.Appx. at 632. Assuming without deciding that Plaintiff established the complained-of conduct was indeed harassment, the Court finds that Plaintiff fails to establish any harassment was race based, with the possible exception of the two comments made by Ms. Mallinson. *See Ellis v. Principi*, 246 Fed.Appx. 867, 871 (5th Cir. 2007)(plaintiff's complaints of delayed pay stubs, W-2s, and worker's compensation forms, along with allegations she was more closely monitored and denied a performance award did not support hostile work environment without evidence connecting it to her race). Plaintiff offers no evidence which creates a fact question that the complained-of hostility was racially motivated. Just as with her discrimination claim,

Plaintiff's subjective belief that the conduct was racially motivated is not sufficient, without more, to establish a hostile work environment.  *See Cavalier v. Clearlake Rehab. Hosp., Inc.*, 306 Fed. Appx. 104, 107 (5th Cir. 2009).

The Court will now address Plaintiff's allegations regarding the two comments made by Ms. Mallinson, a white co-worker.  Assuming without deciding that these comments were race based harassment, the Court concludes that Plaintiff did not, and cannot, show these comments were "sufficiently severe or pervasive" affecting a term, condition or privilege of her employment.  *See Celestine*, 266 F.3d at 353.  The first comment was made by Ms. Mallinson at lunch that her aunt said "all black people stink." While understandably offensive, this comment is more akin to an off-hand comment.  *See Turner*, 476 F.3d at 348 (offhand comments, unless extremely serious, cannot support a discriminatory charge that will survive summary judgment).  It simply does rise to the level of severe or pervasive verbal intimidation, ridicule, or insults driven by discrimination.  *See Howard*, 447 Fed.Appx. at 632.  Notably, Plaintiff admits that she did not complain to Defendant about this comment or in any way make Defendant aware this comment was made.

Plaintiff refers to a second comment Ms. Mallinson made.  Plaintiff states that while she was with Ms. Levine, an African-American co-worker, Ms. Mallinson said to Ms. Levine, "'I bet you couldn't say no if I tightened this noose around your neck.'" Such reference to a noose is certainly racially inappropriate, highly insensitive, and basically inexcusable.  However, it also is not sufficiently severe and pervasive.  The evidence

clearly establishes this was an isolated incident.  Plaintiff denied ever hearing a similar comment repeated, nor did she allege a pattern of race based comments.  The Court finds this comment also to be a stray remark, not sufficiently severe or pervasive to create a genuine fact issue.  *See Turner*, 476 F.3d at 348 (supervisor's racially insensitive comments, including reference to "ghetto children," were not sufficiently severe or pervasive); *Boyd v. State Farm Ins. Co.*, 158 F.3d 326, 329-30 (5th Cir. 1998)(supervisor referred to plaintiff once as "Buckwheat" and another time as "Porch Monkey" but these were isolated, stray remarks that could not support an inference of discrimination); *Carter v. Luminant Power Services Co.*, Civ. No. 3:10-CV-1486-L, 2011 WL 6090700, *30 (N.D. Tex. Dec.6, 2011)(Lindsay, J.)(plaintiff finding a noose at his workplace was an isolated incident that was not severe or physically threatening or humiliating where no threatening displays or conduct were accompanied and there was no reference to the plaintiff in connection with it); *see also Cavalier*, 306 Fed. Appx. at 107 (single comment about "beat the tar off of him" and two references to plaintiff as "boy", although arguably race based, were not sufficiently severe or pervasive to establish hostile work environment).

The Court is sympathetic to the insensitive and inappropriate nature of these comments.  However, Plaintiff offers no evidence of an ongoing pattern of racially based comments, sufficiently severe and pervasive that it altered the terms and conditions of her employment with Defendant.  Plaintiff has failed to meet the demanding standard of a hostile work environment claim.  *See also Howard*, 447Fed.Appx. at 632 (plaintiff argued there was "generally an environment hostile to African-Americans" at his former

workplace, but he failed to establish a severe and pervasive hostile work environment with evidence of one racially inappropriate comment).  Accordingly, Defendant is entitled to summary judgment on Plaintiff's claim for hostile work environment.

### III.    Defendant's Objections to Plaintiff's Appendix of Exhibits

Also before the Court is Defendant's Objections to Plaintiff's Appendix of Exhibits to her response to the motion for summary judgment.  The Court reaches the same resolution of Defendant's Motion for Summary Judgment whether or not it considers the evidence to which Defendant objects.  Accordingly, the Court **overrules** the objections as **moot.**

### IV.    Conclusion

Summary judgment is appropriate as to all of Plaintiff's claims against Defendant. Accordingly, the Court **grants** Defendant's motion for summary judgment and Plaintiff's claims are **dismissed with prejudice**.

SO ORDERED.

Signed March 8th, 2012.

_Ed Kinkeade_____
ED KINKEADE
UNITED STATES DISTRICT JUDGE